[No. 20233. In Bank. — January 19, 1887.]

## THE PEOPLE, RESPONDENT, *v.* J. M. GONZALES, APPELLANT.

CRIMINAL LAW — MURDER — EVIDENCE OF DECLARATIONS OF THIRD PERSON — RES GESTÆ — CO-CONSPIRATOR. — On a trial for murder, the prosecution, after giving evidence tending to show that the deceased believed the defendant to be the paramour of his mother, and that he was killed while endeavoring to eject the defendant from her house, offered in evidence certain declarations made by her after the commission of the homicide and in the absence of the defendant, tending to show the meritricious relation existing between them, and that she sympathized with the defendant rather than with the deceased, and approved of the killing. *Held,* that the evidence was prejudicial, and was not admissible either as part of the *res gestæ* or as the declarations of a co-conspirator.

ID. — HEARSAY EVIDENCE. — In such a case, evidence of declarations descriptive of the homicide, made in the absence of the defendant by a person who was present at the killing, is hearsay.

ID. — JUSTIFIABLE HOMICIDE — BELIEF OF DEFENDANT IN NECESSITY OF KILLING. — To warrant a verdict of justifiable homicide, it is not enough for the jury to believe that the defendant at the time of the killing had an apparent and reasonable ground to apprehend great bodily harm or death at the hands of the deceased; they must further be of opinion from the evidence that the defendant entertained such belief and acted upon it.

ID. — PRETENSE OF NECESSITY — FAULT OF DEFENDANT. — An instruction that a person "cannot in any case justify killing another by a pretense of necessity unless he was wholly without fault in bringing that necessity on himself," is erroneous.

71 | 569
75 | 113
71 | 569
89 | 516
71 | 569
93 | 483
71 | 569
109 | 463
71 | 569
111 | 627

ID. — SELF-DEFENSE — INSTRUCTION. — An instruction that in order to jus-
tify a homicide on the ground of self-defense, the necessity for the
killing "must be apparent, actual, imminent, absolute, and unavoidable,"
is contradictory and misleading.

ID. — INSTRUCTION AS TO APPARENT NECESSITY. — An instruction as to what
constitutes a justifiable killing in self-defense, which excludes from the
consideration of the jury the question whether or not the defendant had
apparently, to his comprehension as a reasonable man, the means at hand
to avoid killing his assailant without incurring imminent danger of losing
his own life or of having great bodily harm done to his person, is erro-
neous.

ID. — DUTY OF PERSON ASSAILED TO AVOID ATTACK. — A person who ex-
pects to be attacked is not always compelled to employ all the means
in his power to avert the necessity of self-defense before he can exercise
the right of killing his assailant.

ID. — MISLEADING INSTRUCTION. — A certain instruction quoted in the opin-
ion as to the right of the defendant to visit the place of the homicide,
held, properly refused on the ground that it was calculated to mislead
the jury.

APPEAL from a judgment of the Superior Court of Del
Norte County, and from an order refusing a new trial.

The facts are stated in the opinion.

*R. W. Miller*, and *R. G. Knox*, for Appellant.

*Attorney-General Marshall*, for Respondent.

FOOTE, C.—The defendant was convicted of murder
in the first degree; from the judgment therein, and an
order denying him a new trial, he has appealed.

His first contention is, that the court erred in allow-
ing the statements of a Miss Umphlet and of her little
daughter (made to divers persons after the alleged crime
had been committed by the defendant, and when he was
not present) to be given in evidence by those who had
heard Miss Umphlet and the daughter make them.

The declarations, as detailed by Dr. Thorworth, at
page 40 of the transcript, were: "Miss Umphlet [that
is, the deceased's mother] appeared at the door, — was
there, and some others; I asked them to move the man
into the house. The door was closed, and it seemed

rather strange that his mother was not by him. I knew nothing of the facts of the matter; I opened the door, and she appeared. I asked if she had any objection to having the injured man brought into the house. She said that she had no particular objection, but that she would not remain there,—she would leave. I told her I did not care where she went, so that the boy was brought into the house. She afterward returned, after an hour or two, and remained there all night."

By Lewis Lockwood, on page 84: " Yes; she [that is, Miss Umphlet] said that first she asked her daughter what she was doing there ? She told her she had come to see me, or Lew. Miss Umphlet says: ' The Professor [meaning the defendant] has shot George [the deceased], and I hope Frank Thraine has got his belly full.' "

By Alonzo Winton, at page 95: " In a very short time after I got up there, Miss Umphlet came in with her daughter. I told her there was nobody there but Mrs. Storver's little boy and me. She asked where she was, and I told her she was at my house, and was going to stay all night. She turned around, and said, ' All right,' and gave her head a toss, and went out."

By Lillie McVay, at page 97: " Some one asked her if George was dead. She said, ' No.' Joe Otto asked her if he soon would be; she said she guessed so. She then told us this story: She said George came to the door. She asked who was there, and George said, ' Me.' She opened the door, and he came in. He jumped for the Professor, and she jumped between them. She said that she knew he would not shoot her. She said that she knew if the Professor ever got a bead on him, he would fetch him so quick [snapping he fingers]."

By Chauncey Messenger, at pages 107, 108, 109. " She [meaning Miss Umphlet] told me about the boys coming there, and disturbing them. They were playing cards. She said that she thought the boys would have done better to have attended to their own business, and

cleaned up their own dirty work, than to be meddling with hers. . . . . She said that they took the Professor out-doors, and when they got him out he broke loose, and ran back in the house, and turned around, and shot George. . . . . She said that she thought it was a good thing that it happened; that it would learn people to keep their nose out of other people's business, and that the Professor did right, she thought, because he had been told by the officer not to leave; that he did not have to leave, and that she did not think that they could do any-thing with him. . . . . She did not say she had another pistol. I was talking to her about the way she was talk-ing around the house. I told her she had better go a little slow, and kind of behave herself,—that she might be arrested herself. She threatened to put me out of the house, and called me some pretty rough names. I told her she had better behave herself,—that she was liable to get into trouble herself. She said that she was not afraid of the sons of bitches,— that she was heeled herself."

By Pat Gay, at pages 111, 112: "When I got there Frank Thraine was crying around there, and she called him a bellowing calf, and told him he ought to be locked up in the cooler. She said she knew if the Professor ever got a bead on one of them he would catch him. He had been a soldier, or something like that; that was after I went into the house. Somebody said that 'hang-ing was too good for her,' and she said she knew where another pistol was, and some of them would get it if they didn't watch out."

By Lizzie Higgins, at page 129: "She came in, and asked for a bed, and Lillie told her that she could not give her a bed until her mother came. She sat down, and took off her things. Joe Otto asked her how the trouble began. She said George and Frank Thraine came there, and they rapped on the door; she asked who was there, and George said it was him; she went and

opened the door, and they rushed in. When Frank
Thraine started to come in she pushed the door to keep
him out. George came in with a pistol in his hand; she
got between him and the Professor, and told him not to
shoot, but he shot a bullet through the floor. Frank
Thraine got hold of the Professor, and pulled him
through the door. While they were out there Professor
got a bead on him, and she said he brought him as
quick as that [snapping her fingers]."

By James Trimble, at page 141: "I did not hear Miss
Umphlet say anything about it. At another time the
little girl came into the house, just after the shooting,
where I was, and says: 'I think they have killed my
brother; the Professor shot poor George.' Then she
said they came pretty near shooting me; she said the
bullet went about so far from me, and she held up her
hands about that far apart. This happened before I
went out of my brother's house."

He stated the same in substance, when recalled, at
page 185.

According to the record, the deceased, George Kirk-
ham, was the son of the person called Miss Umphlet.
She had, before the killing, been divorced from her hus-
band, and had but lately moved into the dwelling where
she resided at the time of the homicide. It seems that
certain reports had reached the ears of the son, relative
to a supposed intimacy between his mother and the de-
fendant.

That indignant, as may be supposed, at that which
he believed was the guilty conduct of the pair, the son
had determined, in conjunction with a companion, one
Frank Thraine, to put a stop to the disgraceful conduct
which he believed existed, and that the defendant was
warned by one or both of the companions to leave the
town where he was then residing, and visiting Miss
Umphlet; that he sought advice of an officer, who told
him he had a right to stay where he was; that he did

stay, and procured a pistol, as he claims, for purposes of self-defense.

That the two young men, Kirkham and Thraine, came at night to Miss Umphlet's house, one of them, Kirkham, with a pistol in his hand, and ordered the defendant to leave, which he proceeded to do, aided in his retirement by Thraine, who held him by the hair, and conducted him to the gate; that there he got loose and ran back to the house, where he shot the deceased.

There is evidence in the record tending in some degree to show that such a connection existed between the defendant and the deceased's mother, Miss Umphlet, as he, Kirkham, apprehended. There is also evidence tending to show that the defendant armed himself, expecting an attack from those parties, and went to the house of Miss Umphlet, supposing it might be made on him there.

There were also facts and circumstances developed in evidence which tended to prove that Miss Umphlet knew of the defendant's intentions, and did not dissuade him from putting them into execution, but rather encouraged him.

It was perhaps desired by the prosecution to bring out fully before the jury the fact that Miss Umphlet was the paramour of her son's slayer, and that she sympathized with him rather than her son, and approved of the killing of the latter. For this purpose they may have sought to show the acts and declarations of Miss Umphlet after the killing and when the defendant was not present.

A portion at least of the several statements of the above-named witnesses, narrating as they did the alleged declarations of Miss Umphlet, certainly tended to exhibit her and the defendant, as regarded their relations, in no enviable light before the jury, and as both being hostile to the deceased, and we cannot say that they may not have proved prejudicial to the defendant.

Miss Umphlet was not a witness before the jury, and

her alleged declarations, being made after the full accomplishment of the homicide, were not a part of the *res gestæ.*

Even admitting that other evidence in the record tended to demonstrate that she had conspired with the defendant unjustifiably to slay George Kirkham, yet her narrations (made after the crime with which the former was charged had been fully consummated) were not admissible against him.

Prejudicial error was therefore committed in allowing them to go to the jury. (*People* v. *English,* 52 Cal. 212; *People* v. *Aleck,* 61 Cal. 137–139.)

The daughter's statement, made after the killing, and without the presence of the defendant, and related by Trimble, was not admissible; it was mere hearsay.

The defendant further complains that two of the instructions which he asked to be given by the court to the jury were refused. They are as follows: " If the jury find from the testimony that at the time of the killing of deceased the defendant had been assailed by the deceased and one Thraine in a violent and threatening manner, and that deceased at the time of the assault held in his hand a deadly weapon, to wit, a revolver; and if you find that such assault was made with intent to forcibly evict the defendant from the house of Ellen Umphlet, where the killing was done, — then I charge you that such assault was unlawful; and if the circumstances attending such assault were such as to cause a reasonable man to believe that he was in danger of receiving great bodily injury at the hands of his assailant, then I charge you that he was justifiable in taking the life of his assailant."

" If the jury find from the testimony that defendant had been warned to leave the county of Del Norte or any place within said county, and that he subsequently made diligent inquiry as to the existence of danger, and from such investigation reasonably believed that he had no occasion to fear assault, and that defendant acted in

good faith upon such reasonable belief, then I charge you that the visiting of the house of Ellen Umphlet upon her invitation was not an unlawful act, and that a person acting under such circumstances cannot be said to have voluntarily sought a place of danger."

In the first instruction the jury were not told, as they should have been, that they must be of opinion, from the evidence, that the defendant *believed* he was in imminent danger of death, or some great bodily harm then about to be done him at the moment of the killing by his assailants; for it is not enough that the jury may believe one killing his adversary has an apparent and reasonable ground then and there to apprehend great bodily harm or death at the hands of his adversary; they must further be of opinion, from the evidence before them, that the defendant entertained such belief and acted upon it.

The defendant seems to be of opinion that his second instruction should have been granted, because, as he claims, the prosecution had shown in evidence that the defendant had been warned by the deceased and Thraine to leave the county, and had not done so, and had gone to Miss Umphlet's house in defiance of such order, and that in consequence of such evidence, the jury, without such an instruction as he sought, might have been led into the error of believing that the defendant, in not obeying the order and going to Miss Umphlet's, unlawfully sought the difficulty.

There was no charge of the court given upon its own motion, or by request of the prosecution, which instructed the jury that such was the law, and we cannot conceive how any man of ordinary intelligence could be otherwise led to such a belief as a juryman.

The instruction was also quite obscure in its language, enunciated no clear proposition of law, and was calculated to mislead the jury.

The defendant further urges upon our attention, as an

improper act committed by the trial court to his prejudice, the granting over his objection of instructions propounded by the prosecution, and numbered 7, 8, 10, 11, 14, 16, 17, 18, and 19.

The tenth instruction does not enunciate a correct proposition of law where it declares that one "cannot in any case justify killing another by a pretense of necessity unless he was wholly without fault in bringing that necessity on himself"; for cases may, and frequently do, occur in which the aggressor, although primarily in fault, has really and in good faith sought to avoid further conflict before the mortal blow was given, and when this is apparent and he slay his antagonist in the necessary defense of his own life, he is not guilty of any crime.

The seventeenth instruction, in the first sentence thereof, which reads thus: "But the necessity must be apparent, actual, imminent, absolute, and unavoidable," is contradictory and misleading.

It should have been expressed in the following or like language: "But the necessity must be actually or apparently imminent, absolute, and unavoidable."

For it is not necessary that a defendant should show that danger to him of loss of life, or danger of some great bodily harm then about to be done him, actually existed; for actual, real, and imminent danger to his comprehension as a reasonable man is sufficient. (*People* v. *Anderson*, 44 Cal. 65–69.)

The eighteenth instruction excludes from the jury the consideration of the proposition, whether or not from the evidence the defendant had apparently to his comprehension as a reasonable man the means at hand to avoid killing the deceased without incurring imminent danger of losing his own life, or imminent danger of having great bodily harm done to his person.

The nineteenth instruction is clearly wrong.

A man who expects to be attacked is *not* always com-

pelled to employ all the means in his power to avert the necessity of self-defense before he can exercise the right of self-defense. For one may know that if he travels along a certain highway he will be attacked by another with a deadly weapon, and be compelled in self-defense to kill his assailant, and yet he has the right to travel that highway, and is not compelled to turn out of his way to avoid the expected unlawful attack.

In this case, the defendant had a right to go to Miss Umphlet's house, if invited there by her, even if he expected there to be attacked, and the fact that he did go there did not of itself take away from him the right of self-defense, if unlawfully attacked.

The other instructions assailed as incorrect are neither so accurate or intelligible as they might well have been, but they are not so clearly erroneous, when taken in connection with the rest of the charge, as to demand on that account alone the reversal of the judgment and order.

Yet, for the reasons heretofore given, they should be reversed, and the cause remanded for a new trial.

SEARLS, C., and BELCHER, C. C., concurred.

The COURT. —For the reason given in the foregoing opinion, the judgment and order are reversed, and cause remanded for a new trial.