[Crim. No. 15222. In Bank. Sept. 5, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
WARREN O. SALING, Defendant and Appellant.

**COUNSEL**

Michael Korn, under appointment by the Supreme Court, for Defendant and Appellant.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, and William V. Ballough, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**WRIGHT, C. J.**—Defendant Warren O. Saling was charged jointly with Sean J. Murphy by indictment for conspiracy to commit first degree murder (Pen. Code, § 182) and the first degree murder of Murphy's wife, Catherine (Pen. Code, §§ 187, 189). Defendant pleaded not guilty to the charged offenses. The trial court granted his motion for severance but denied his motions to dismiss the indictment (Pen. Code, § 995) and to suppress incriminating tape recordings of conversations between his alleged coconspirators (Pen. Code, § 1538.5). The jury found defendant guilty as charged, and after the penalty phase of the trial, returned a verdict of death for each of the charged offenses.[1] His motions for mistrial and a new trial were denied; his appeal is automatic (Pen. Code, § 1239, subd. (b)).[2]

Defendant contends, inter alia, that (1) statements made by one of his coconspirators three days after the charged murder and (2) recordings of conversations between other coconspirators made almost three and one-half weeks subsequent to the charged murder were erroneously and prejudicially received at trial. The errors are predicated on defendant's contention that the extrajudicial statements constituted inadmissible hearsay which did not come within the coconspirators exception. (Evid. Code, § 1223.) We hold that, although the statements made three days after the murder were properly received, the admission of the recordings constituted error, the prejudicial effect of which becomes manifest upon a detailed examination of the evidence. We are thus compelled to reverse.

On August 22, 1969 at approximately 10 p.m., William Mulhearn was traveling through Lopez Canyon in Los Angeles County and was "waved down" by Sean J. Murphy.[3] Murphy told him that his wife, who was lying near the Murphy automobile, had been hurt. He asked Mulhearn to call the police. When Deputy Sheriff Barrett Fitzgerald arrived at Lopez Canyon a few hours later to investigate the incident he found the dead body of Catherine Murphy, a pool of blood behind a nearby bush and drag marks

---

[1] The separate trials of defendants each resulted in sentences of death. Murphy's automatic appeal (Crim. 15221) is now pending but not before us in these proceedings.

[2] The proceedings herein all occurred prior to our decision in *People* v. *Anderson* (1972) 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880].

[3] Reference at trial to August 25th, 1969 as the date of the homicide is apparently in error since the 25th was a Monday and all parties agree that the homicide occurred on a Friday evening. However, with the aid of other record matters we have concluded that the correct date was August 22. In so doing we also observe that undisputed evidence at Murphy's trial establishes that the date on which the murder occurred was August 22.

extending from the bush to where her body lay. A short distance to the north Fitzgerald noticed tire tracks similar to the tires on Murphy's car.

Later on the morning of August 23 Murphy related to Fitzgerald that he and his wife had been driving through Lopez Canyon after failing to locate a house trailer which, according to Murphy, was for sale. They were stopped by a man who claimed that his vehicle was out of gas. Murphy agreed to drive him and his friend to a service station. After traveling only a short distance Murphy was told, "This is a stickup," and was ordered to drive off the road and stop the car. The Murphys were instructed to get out of their automobile. Shortly thereafter, Murphy continued, he was hit on the head and rendered unconscious and his wife apparently received five fatal stab wounds. When he regained consciousness he heard his wife moaning, and he dragged her from behind a bush to the point where she was later seen by Mulhearn and Fitzgerald.

Sometime after August 29, 1969, Jerry Carnes was arrested for conspiracy in the homicide of Catherine Murphy. Following his release from custody, apparently for the purpose of assisting investigating officers, Carnes allowed Fitzgerald to affix an induction coil to his telephone and to record a conversation between him and Murphy on September 18. The following day Carnes' brother, Richard, authorized Deputy Sheriff William Allen to conceal a transmitting device in Richard's clothing and to record a conversation between him, his brother and Murphy. Both recordings contain incriminating statements which seriously implicate defendant in a conspiracy entered into upon Murphy's solicitation to kill the victim.

Jerry Carnes was granted immunity from prosecution and testified that sometime in the latter part of July 1969 Murphy telephoned him and asked whether he wanted to make some money by "roughing up" a person who owed Murphy money. Carnes replied that he did not do that type of thing but would ask among the people he knew. He eventually went to the home of defendant whom he also knew as "Dusty" and defendant agreed to do the job. About two hours later Carnes brought Murphy to defendant's house to discuss the amount of payment and how the plan was to be carried out. Carnes testified that he did not pay close attention to the conversation but remembered that $300 or $500 was to be paid in advance. Murphy later disclosed the plan to Carnes. Murphy was to drive the victim into Big Tujunga Canyon and, on the way out, pretend to have a flat tire. He would stop the car on the side of the pavement and arrange to have the victim remove the lug nuts from the wheel nearest the center of the road while Murphy removed a spare tire from the trunk. Defendant would then drive by and "clip" the victim while "he" was loosening the lug nuts. Carnes

was to call the police after the accident, claiming to be a witness. Carnes said that during the course of their conversation Murphy referred to the victim as "her" one or two times.

On the evening of the homicide Carnes went to Big Tujunga Canyon about 7:30 p.m. and parked at a predesignated spot. Approximately 45 minutes later he saw Murphy drive into the canyon with a woman in the car. Carnes stayed there for a short time while Murphy, waiting for defendant, drove back and forth. Defendant did not appear. Carnes left the canyon about 8:30 p.m. and shortly thereafter recognized defendant and Robert "Pokey" Jurgenson driving toward the canyon in an automobile.[4] They stopped their cars and talked briefly. Defendant said that he was late because the police had detained him and indicated that he would contact Murphy later. Nothing more was said concerning the plan. Carnes left and thereafter did not see defendant. Mrs. Murphy was killed that evening.

Carnes learned of the victim's death three days after the homicide and visited defendant at his home. Jurgenson, who was also present when Carnes arrived, stepped outside to talk with Carnes. In response to Carnes' statement that he thought there was only supposed to have been a "rough up," Jurgenson replied that the plan was again discussed after their initial meeting and he and defendant discovered for the first time that the victim was to be Murphy's wife. Jurgenson also said that after he and defendant saw Carnes near Big Tujunga Canyon they drove to Lopez Canyon.[5] They flagged down Murphy's car in the canyon and informed him that their car was out of gas. Murphy agreed to drive them to a service station. After a short distance had been traveled they told Murphy that he was being robbed and instructed him to drive down the road, pull over and get out of the car. Jurgenson continued, stating that Murphy and his wife left the car and were forced off to the side of the road. Murphy was then hit on the back of the head and his wife was stabbed "two or three times." Defendant was present during a portion of this conversation and, while he was there, told Carnes to "keep his mouth shut."[6]

---

[4]It has not been called to our attention what charges if any were made against Jurgenson. In the second recorded conversation (between Jerry and Richard Carnes and Murphy) Murphy purportedly states, at a time before defendant and Murphy were indicted, that Jurgenson was "sent . . . up on parole violation and narcotics possession."

[5]The record is silent as to what happened between the time Carnes met defendant and Jurgenson and the events immediately prior to the homicide. Moreover, the record does not indicate how defendant and Jurgenson knew that Murphy would shortly thereafter be driving through Lopez Canyon.

[6]The People contend that Jurgenson's incriminating statements were admissible as "implied [adoptive] admissions" of defendant. It should be noted that defendant

Jerry Carnes' account of the foregoing events is corroborated in a number of significant respects. A witness testified that Carnes came to her home about seven days prior to the murder and told her that Murphy was looking for him to arrange for "roughing up" someone, but that Carnes "did not want any part of it." It also appears that defendant's common law wife complained to Deputy Sheriff Fitzgerald that it was "too bad [Carnes] had to get away with his part in this deal." Richard Carnes testified that he was acquainted with Jurgenson and defendant—and knew the latter as "Dusty" —and that at least on one occasion had seen his brother, defendant and Murphy together. On a different occasion he overheard "something about getting somebody roughed up." Richard further testified that after the homicide Murphy called the cycle shop where Richard was an employee and told him that he had some money for Jerry and defendant. Richard arranged to accept, and in fact did accept, $700 for them. He later gave $200 of the money to Jerry and the remaining $500 to defendant. There was also testimony by a babysitter in defendant's household that she had overheard defendant discuss with his common law wife a payoff of $300 which defendant was to have received from someone. The babysitter further testified that defendant and Jurgenson asked her to provide an alibi for them for the night of the homicide.

Additionally, defendant was connected with a particular maroon Pontiac automobile which, according to a criminalist, was at the scene of the homicide. The vehicle was loaned to defendant by a former used car dealer about the middle of August 1969. A neighbor of Jurgenson testified that he had seen the vehicle at the Jurgenson home on a few occasions and had seen defendant come out of Jurgenson's house at least once. The car was returned to the driveway at the owner's residence on the night of the killing. The criminalist testified that a tire track near the scene of the murder had many characteristics similar to a tire on the particular maroon Pontiac.

There was, finally, testimony which tended to establish that Murphy was motivated to bring about his wife's death because he would receive proceeds from various insurance policies which he had arranged to be placed on her life. On November 1, 1968, applications were purportedly made by the Murphys for insurance policies on their respective lives. In January 1969 a $13,815 policy was issued on the life of Mrs. Murphy with Mr. Murphy as the primary beneficiary. A policy insuring the life of Mr. Murphy was also issued but was returned to the company in February 1969 after

was not present during the entire conversation between Jerry Carnes and Jurgenson. In the absence of a showing by the People of precisely when defendant was present during Jurgenson's admissions we cannot assume that he adopted all or any of them.

he refused to accept delivery. There was expert testimony that Murphy wrote his wife's name on the application for the policy on her life and additionally signed her name on a card authorizing the bank in which the Murphys maintained an account to make withdrawals to pay the premiums when drafts therefor were submitted by the company.

On November 8, 1968, a $10,000 policy with a double indemnity clause was issued by a second company on the life of Mrs. Murphy. Mr. Murphy was named as the primary beneficiary. The same company, on July 17, 1963, had also issued a $5,000 family policy with double indemnity provisions to the Murphys (Catherine Murphy's single indemnity being $1,250). A third company carried the Murphy's automobile insurance obtained in October 1967 which provided for a $15,000 indemnity in the event either insured was killed by a hit-and-run driver.

*Admissibility of the Conversation Between*
*Jerry Carnes and Robert "Pokey" Jurgenson*

Defendant first contends that the trial court prejudicially erred in allowing Jerry Carnes to relate the conversation he had with Jurgenson outside defendant's house three days after the homicide. He argues that the statements were hearsay (Evid. Code, § 1200), were not made during or in furtherance of any conspiracy and, therefore, were erroneously admitted under the coconspirators exception to the hearsay rule (Evid. Code, § 1223).[7] The People concede that the statements were hearsay but maintain that they were properly admitted under the coconspirators exception because they were made "during the conspiracy, several weeks before defendant was paid." They argue that since payment to defendant of an agreed sum was one of the objectives of the conspiracy and since it had not yet been attained at the time of the conversation between Carnes and

---

[7]Evidence Code section 1223 provides: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if: (a) The statement was made by the declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of that conspiracy; (b) The statement was made prior to or during the time that the party was participating in that conspiracy; and (c) The evidence is offered either after admission of evidence sufficient to sustain a finding of the facts specified in subdivisions (a) and (b) or, in the court's discretion as to the order of proof, subject to the admission of such evidence."

On the subject of this exception to the hearsay rule, see generally McCormick on Evidence (1954) page 521; 4 Wigmore, Evidence (3d ed. 1940) section 1079; Levie *Hearsay and Conspiracy* (1954) 52 Mich.L.Rev. 1159; Note, *Developments in the Law—Criminal Conspiracy* (1959) 72 Harv.L.Rev. 920, 984-989; Comment, *The Hearsay Exception for Co-Conspirators' Declarations* (1958) 25 U.Chi.L.Rev. 530. See also Model Code of Evidence (1942) rule 508; Uniform Rules of Evidence (1953) rule 63(9).

Jurgenson the latter's statements were made during the criminal enterprise. Defendant's position is untenable.

■ It has long been the law in this state that a conspirator's statements are admissible against his coconspirator only when made during the conspiracy and in furtherance thereof. (Evid. Code, § 1223 [former Code Civ. Proc., §§ 1848, 1870, subd. 6]; *People* v. *Irwin* (1888) 77 Cal. 494, 504 [20 P. 56]; *People* v. *Aleck* (1882) 61 Cal. 137, 138-139; *People* v. *Moore* (1872) 45 Cal. 19, 21; *People* v. *Pool* (1865) 27 Cal. 572, 576.)
■ The conspiracy usually comes to an end when the substantive crime for which the coconspirators are being tried is either attained or defeated. (See, e.g., *People* v. *Aleck, supra,* 61 Cal. 137, 138-139; see also *People* v. *Oldham* (1896) 111 Cal. 648, 652-653 [44 P. 312]; *People* v. *Dilwood* (1892) 94 Cal. 89, 91 [29 P. 420]; *People* v. *Gonzales* (1887) 71 Cal. 569, 575 [12 P. 783].) It is for the trier of fact—considering the unique circumstances and the nature and purpose of the conspiracy of each case—to determine precisely when the conspiracy has ended. (*People* v. *Smith* (1966) 63 Cal.2d 779, 794 [48 Cal.Rptr. 382, 409 P.2d 222]; *People* v. *Holmes* (1897) 118 Cal. 444, 459 [50 P. 675].) Particular circumstances may well disclose a situation where the conspiracy will be deemed to have extended beyond the substantive crime to activities contemplated and undertaken by the conspirators in pursuance of the objectives of the conspiracy. (See, e.g., *People* v. *Collier* (1931) 111 Cal.App. 215, 237 [295 P. 898]; *People* v. *Lorraine* (1928) 90 Cal.App. 317, 327 [265 P. 893]; but see *Krulewitch* v. *United States* (1949) 336 U.S. 440 [93 L.Ed. 790, 69 S.Ct. 716] (action taken for the mere purpose of concealing the conspiracy or the substantive crime deemed not to extend the conspiracy to that point in time).)

■ Clearly the money offered by Murphy for killing his wife motivated defendant and Jerry Carnes to participate in the plan, and the transfer of the money was one of its main objectives as far as defendant and Carnes were concerned. Since payment to either defendant or Carnes had not yet occurred by the time of the conversation between Carnes and Jurgenson only three days after the murder, Jurgenson's statements to Carnes were admissible as being made during the conspiracy.[8]

---

[8]Although it has been held that statements which merely narrate past events are not to be deemed as made in furtherance of a conspiracy (*People* v. *Smith* (1907) 151 Cal. 619, 625-626 [91 P. 511]; *People* v. *Oldham, supra,* 111 Cal. 648, 652-653; *People* v. *Aleck, supra,* 61 Cal. 137, 138-139), such a rule cannot be applied mechanically. Jurgenson's statements to Carnes were clearly made in furtherance of the conspiracy to kill Catherine Murphy, as it was necessary that Carnes be made aware of the departure from the original scheme in order that he, in the best interests of himself and his coconspirators, be able to maintain the integrity of their security until they received payment for their participation in the crime.

Citing *People* v. *Luker* (1965) 63 Cal.2d 464 [47 Cal.Rptr. 209, 407 P.2d 9] defendant argues that since the conspiracy was discovered when Jerry Carnes was arrested, any hearsay admissions made by him must be excluded against his fellow conspirators. He reasons that such statements would not have been made in furtherance of the conspiracy but, rather, in frustration of it. We have been presented with no admissions by Carnes which defendant seeks to exclude and any statements made by Carnes at trial concerning his participation in the scheme are clearly not hearsay (Evid. Code, § 1200).

### Admissibility of the Recordings Made on September 18 and 19

Defendant's next assignment of claimed prejudicial error concerns the trial court's admission of the hearsay recordings made on September 18 and 19, almost three and one-half weeks after the murder. He contends that the recordings did not fall within the ambit of the coconspirators exception to the hearsay rule since they neither were made during nor in furtherance of the conspiracy. We agree.

The statements contained in the recordings were clearly made not only after Catherine Murphy had been killed but also after payment had been made to defendant and Jerry Carnes. It does not appear that the statements were otherwise made during any activity in pursuance of any significant objective of the conspiracy. That the statements in the recordings concerned the method by which detection and punishment were to be avoided is of no moment. In *Krulewitch* v. *United States, supra,* 336 U.S. 440, the Supreme Court rejected, as a further breach of the general rule against the admission of hearsay evidence, the government's argument that "even after the central criminal objectives of a conspiracy have succeeded or failed, an implicit subsidiary phase of the conspiracy always survives, the phase which has concealment as its sole objective." (*Id.* at p. 443 [93 L.Ed. at p. 794].) Mr. Justice Jackson, concurring in the judgment, explained the illogic of the government's position: "I suppose no person planning a crime would accept as a collaborator one on whom he thought he could not rely for help if he were caught, but I doubt that this fact warrants an inference of conspiracy for that purpose. . . . [¶] It is difficult to see any logical limit to the 'implied conspiracy,' either as to duration or means, nor does it appear that one could overcome the implication by express and credible evidence that no such understanding existed, nor any way in which an accused against whom the presumption is once raised can terminate the imputed agency of his associates to incriminate him. Conspirators, long after the contemplated offense is complete, after perhaps they have fallen

out and become enemies, may still incriminate each other by deliberately harmful, but unsworn declarations, or unintentionally by casual conversations out of court." (*Id.* at pp. 455-456 [93 L.Ed. at p. 800] (Jackson, J. concurring); see also Goldstein, *The Krulewitch Warning: Guilt by Association* (1965) 54 Geo. L.J. 133.)[9]

The People make an alternative argument—one with which the trial court agreed—that the recorded conversations were admissible as being made during a conspiracy to collect the proceeds of the insurance policies on the life of Catherine Murphy. The People contend that since such a conspiracy did not end until the insurance proceeds were paid, the statements made by a coconspirator prior to that time were admissible.

■ Before evidence of the acts and declarations of an alleged coconspirator is admissible against the other conspirators prima facie evidence of the conspiracy must be proved. (Evid. Code, § 403; *People* v. *Steccone* (1950) 36 Cal.2d 234, 238 [223 P.2d 17].) ■ We have carefully examined the lengthy record and are compelled to the conclusion that there was no evidence, other than the recordings themselves, to constitute a prima facie showing of the existence of the claimed insurance conspiracy. The only admissible evidence adduced at trial concerning insurance was that (1) there were life insurance policies insuring Catherine Murphy in the total amount of $25,665; (2) the Murphys had an automobile insurance policy containing an uninsured motorist provision which allowed either insured to recover $15,000 if injured or killed as the result of being struck by a hit-and-run driver; and (3) Murphy apparently had forged his wife's signature on an application for one of the insurance policies and the authorization card for that policy. Aside from the recordings, the receipt of which is sought to be justified on the independent showing of an insurance conspiracy, there is nothing in the record to indicate that defendant or the Carnes brothers were involved in a conspiracy to collect the proceeds of

[9]In *Grunewald* v. *United States* (1957) 353 U.S. 391 [1 L.Ed.2d 931, 77 S.Ct. 963], the Supreme Court again refused to "accede to the proposition that the duration of a conspiracy can be indefinitely lengthened merely because the conspiracy is kept a secret, and merely because the conspirators take steps to bury their traces, in order to avoid detection and punishment after the central criminal purpose has been accomplished." (*Id.* at p. 405 [1 L.Ed.2d at p. 943].) It noted, however, that "[b]y no means does this mean that acts of concealment can never have significance in furthering a criminal conspiracy. . . . [A] vital distinction must be made between acts of concealment done in furtherance of the *main* criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the purpose only of covering up after the crime." (*Id.*; see also *Dutton* v. *Evans* (1970) 400 U.S. 74, 81-82 [27 L.Ed.2d 213, 222-223, 91 S.Ct. 210].)

the insurance policies, nor is there any evidence from which we may infer the existence of such a conspiracy.[10]

Holding that the hearsay recordings were erroneously admitted as not falling within any exception to the hearsay rule does not necessarily warrant reversal. It must also be evident that " 'after an examination of the entire cause, including the evidence,' . . . it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of error." (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) As stated above, we have read the entire record, including the transcripts of the recordings. Although the competent evidence of defendant's guilt is substantial, it is not compelling. Jerry Carnes testified that defendant conspired to "rough up" a victim who might have been Catherine Murphy. Defendant was seen in the general vicinity of the crime with Jurgenson who later stated that he and defendant had killed the victim in a manner consistent with the physical evidence of her death. Defendant was also connected with the killing by evidence that placed his automobile at the scene of the crime; that Murphy transferred money to him; and that he attempted to arrange for an alibi at the time of the killing.

The recordings, on the other hand, are extremely damaging to defendant. They compel the inference, particularly when considered with the competent evidence, that Murphy initiated a conspiracy involving Robert "Pokey" Jurgenson, Jerry Carnes and defendant (the latter two being paid for their participation) to murder Murphy's wife and that she was killed as a result of that conspiracy. The recorded discussions generally relate to the progress the investigating officers were making and the manner in which Murphy and the Carnes brothers should conduct themselves in order to frustrate the investigation. Great concern is expressed that defendant and Jurgenson might "sing" and what strategy Murphy and the Carnes brothers should adopt in such event. Comment is made that defendant had agreed to "take the rap without involving anybody else" in the event "anything went wrong" and that defendant was "pretty scared." Again great concern is expressed when it appeared that defendant had returned from some undesignated

---

[10]The only reference to insurance in the recordings was by Richard Carnes, as follows: "RICHARD CARNES: Has the insurance contacted you or anything? MR. MURPHY: No. No. I haven't even had death certificates or anything like that yet. RICHARD CARNES: They haven't said anything to you? MR. MURPHY: No. Oh, I got a call from my insurance (Unintelligible)—and he said, 'As soon as you get a death certificate I'll come over and talk to you.' . . . RICHARD CARNES: How much are you getting? MR. MURPHY: Five Grand. RICHARD CARNES: Is that all? MR. MURPHY: Well, I told him that if I wanted to use my car I'd get fifty grand. . . . But if I did . . . I'd be hung. . . . MR. MURPHY: I wasn't doing this for insurance."

place and might still have in his possession "the knife" and the victim's credit cards. Murphy indicates that defendant "had everything in his pocket. . . . [and Murphy had not] laid eyes on the guy since that night." Murphy also states, inconsistently with his statements to the investigating officers, that "I laid her down there—[she was] unconscious at this stage but the blood was still coming from the jugular vein—it looked like you just turned on a faucet in a house." When Jerry Carnes indicates that he would have been nauseated, Murphy mentions that it was for such reason that defendant did not want Jerry to be present. At other points in the conversations the possibility of defendant signing a confession, particularly if he was "high" when picked up, is considered, and it is speculated that, if they are not careful, all of them will end up "in the chair . . . [a]s a matter of fact, they would probably put three more chairs up there."

The foregoing and other incriminating remarks were related under circumstances which would necessarily persuade a trier of fact of their truth. In addition, the recordings contained other remarks of an inflammatory nature from which it could be concluded that defendant was a dope addict and under the influence of heroin at the time of the killing and that he had on some earlier occasion driven his vehicle over the body of a police officer.

It appears, then, that the effect of receiving the transcripts of the recordings and thus allowing the trier of fact to consider them together with the competent evidence of defendant's guilt adduced at trial destroyed the force of defendant's testimony that he was innocent and compelled the conclusion of guilt.[11]

We conclude that on our examination of the whole cause it is reasonably probable that a result more favorable to the defendant would have been reached in the absence of the error of receiving the recordings.

The judgment is reversed.

McComb, J., Peters, J., Tobriner, J., Mosk, J., and Burke, J., concurred.

**SULLIVAN, J.**—I concur in the judgment and I join in the majority opinion, except that portion dealing with the admissibility of the conversation between the coconspirator Jerry Carnes and Robert "Pokey" Jur-

---

[11]That the jury gave weight to the recordings is illustrated by the fact that it requested that the recording of the telephone conversation between Jerry Carnes and Murphy be replayed after one day of deliberation during the guilt phase of the trial.

genson. I dissent from the holding that such conversation, which took place three days after the homicide, was admissible as falling within the coconspirator exception to the hearsay rule (Evid. Code, § 1223; see *ante,* p. 851, fn. 7).

Elsewhere in the opinion,[1] the majority properly recognize that a co-conspirator's hearsay statement, to be admissible against his fellow conspirator, must be made "during any activity in pursuance of any significant objective of the conspiracy." (*Ante,* p. 853.) Their holding as to the admissibility of the Carnes-Jurgenson conversation cannot be reconciled with their own correct statement of the law. To reach this result the majority look beyond the charged conspiracy to commit murder and imply an *uncharged* conspiracy to receive payment for the criminal act. Thus they extend the hearsay exception in a manner which, in following *Krulewitch* v. *United States* (1949) 336 U.S. 440 [93 L.Ed. 790, 69 S.Ct. 716], they themselves condemn.

With all respect to my colleagues, I am afraid that they confuse motive with objective. The objective of the conspiracy entered into by Murphy, Carnes and defendant was to murder Murphy's wife. Whatever may have been Murphy's motive for sowing the seeds of the conspiracy, Carnes and defendant joined the scheme for its financial fruits. The different motives of all participants were satisfied by accomplishment of the murder: Murphy was rid of his wife, and defendant and Carnes were entitled to the payoff. No further acts were contemplated by the conspirators, and none were necessary to the completion of the conspiracy's objective. Nor did any common purpose (except perhaps avoidance of detection and punishment) continue to unite the interests of the participants. In fact, Murphy's interests after the murder were somewhat in conflict with those of the hired killers, because he was now financially indebted to them, albeit for an obligation which no court would enforce. To infer from this state of affairs that one of the *objectives* of the conspiracy was Murphy's payment to the others strains credulity. Although it is indisputable that money motivated some of its participants, the financial benefit to the hired killers was not part of the "common design of the conspiracy." (*People* v. *Suter* (1941) 43 Cal.App.2d 444, 458 [111 P.2d 23].)

Besides confusing the motives of the conspirators with the objective of the conspiracy, the majority's holding would perpetuate the life of a conspiracy beyond rational limits. If, for example, Murphy had given his confederates a promissory note rather than cash, would the conspiracy

---

[1]See majority opinion pages 853-856, concerning the admissibility of the recordings made on September 18 and 19, about which the majority reach a different conclusion.

continue until the note was paid? If Murphy defaulted on his promise to pay, would the conspiracy continue endlessly? According to the logic of the majority, and contrary to both established law and the hard realities of life, a conspiracy might last forever. An uncharged implied conspiracy to conceal a crime has properly been held to extend the duration of a conspiracy impermissibly beyond legitimate limits (*Grunewald* v. *United States* (1957) 353 U.S. 391, 404-405 [1 L.Ed.2d 931, 943-944, 77 S.Ct. 963]; *Krulewitch* v. *United States, supra,* 336 U.S. 440, 456 [93 L.Ed. 790, 800-801] (Jackson, J., concurring)). So too, in the case at bench, does the majority's implied uncharged conspiracy to receive payment extend the duration of the conspiracy beyond legally recognized bounds.

Even if we assume for the sake of argument that the Carnes-Jurgenson conversation did occur during the pendency of the conspiracy to murder Mrs. Murphy, it did not further the objective of that conspiracy, as required by Evidence Code section 1223, subdivision (a). The "furtherance" requirement did not expressly appear in Code of Civil Procedure section 1870, subdivision 6, the predecessor to Evidence Code section 1223, but was an additional limitation upon the hearsay exception included in the new statute (*People* v. *Brawley* (1969) 1 Cal.3d 277, 287 [82 Cal.Rptr. 161, 461 P.2d 361], cert. den. *sub nom. Baker* v. *California* (1971) 400 U.S. 993 [27 L.Ed.2d 441, 91 S.Ct. 462]). Although it may be argued that the "furtherance" requirement is superfluous in light of the pendency requirement (Levie, *Hearsay and Conspiracy* (1954) 52 Mich.L.Rev. 1159, 1173), nevertheless we may infer from the above change a legislative intent to narrow rather than to broaden the scope of this exception to the hearsay rule.

In the instant case the objective of the conspiracy was the murder of Mrs. Murphy. Assuming arguendo that payment for the murder was also an objective, the Carnes-Jurgenson conversation, to be admissible, had to be in furtherance of the *receipt of payment,* as the murder was at that time *fait accompli.* But the conversation consists solely of Jurgenson's statements informing Carnes how the *murder* had been carried out and, after joining the others, defendant's admonition to Carnes to "keep [his] mouth shut." Nothing that transpired, it is evident, would have aided these conspirators in furthering the objective of receiving payment for their crime.

The decisional law in California dealing with the evidentiary problem before us provides on the whole for a rational termination of conspiracies. Where evidence has been held admissible, the duration of the conspiracy has extended beyond the substantive crime only to encompass activity directly related thereto (e.g., *People* v. *Rodley* (1900) 131 Cal. 240, 254

[63 P. 351], cert. den. (1901) 183 U.S. 694 [46 L.Ed. 393, 22 S.Ct. 934], conspiracy to fabricate a will and loot estate; *People* v. *Ross* (1941) 46 Cal.App.2d 385, 396 [116 P.2d 81], conspiracy to commit grand theft and divide the proceeds).

In *People* v. *Brown* (1955) 131 Cal.App.2d 643 [281 P.2d 319], cited by the People, I have found the only reference to payment for participation in a crime. In that case a conspiracy to murder Mrs. Brown was held to continue after an unsuccessful attempt on her life, because the evidence showed that the objective of the conspirators to murder her had not been abandoned. The court first correctly stated that a conspiracy " 'may, for various purposes, extend in point of time beyond the actual commission of the substantive crime, providing there is some evidence showing that subsequent activities of the conspirators were a part of their scheme or plan.' " (Fns. omitted.) (*Id.* at p. 656, citing 11 Cal.Jur.2d 223.) Then, as examples of this proposition, the court gave "division of the loot and payment for participation in the crime (*People* v. *Ross* [*supra*] 46 Cal.App.2d 385, 395-396 . . .) and acts contemplating escaping punishment (*People* v. *Tinnin* [1934] 136 Cal.App. 301, 306 . . .)." (*People* v. *Brown, supra*, 131 Cal.App.2d 643, 656-657.) No case was offered to illustrate the example of payment for participation in crime. Notwithstanding the placement of the citation, the *Ross* case illustrates only the "division of the loot" example. Nor does the reference to 11 Cal.Jur.2d 223 yield any such cases. Therefore I consider the *Brown* dictum to be meaningless as support for the conclusion asserted by the People and adopted by the majority.

In opposition to the foregoing cases are those in which the courts have refused to extend the duration of the conspiracy, finding that its objective had either been accomplished or frustrated (*People* v. *Dilwood* (1892) 94 Cal. 89, 91 [29 P. 420]; *People* v. *Irwin* (1888) 77 Cal. 494, 505 [20 P. 56]; *Callan* v. *Superior Court* (1962) 204 Cal.App.2d 652, 664-665 [22 Cal.Rptr. 508]). As the majority note, this determination is generally a question for the trier of fact (*People* v. *Smith* (1966) 63 Cal.2d 779, 794 [48 Cal.Rptr. 382, 409 P.2d 222], cert. den. (1967) 388 U.S. 913 [18 L.Ed.2d 1353, 87 S.Ct. 2119], rehg. den., 389 U.S. 893 [19 L.Ed.2d 211, 88 S.Ct. 13]). But the formula applied by all the cases requires that there be an objective of the conspiracy yet to be accomplished for the conspiracy to continue beyond the commission of the substantive crime. Where the purpose of a conspiracy is theft, the division of the proceeds among the conspirators is logically an integral part of the conspiracy's goal; where the object is murder, on the other hand, accomplishment of that goal generally satisfies the conspiracy's objective, even though the motives of some of the murderers remain unfulfilled.

Two reasons, among others, have been advanced to support the coconspirator exception to the hearsay rule. One assumes that during the attempt to reach a common goal and in furtherance of it the conspirators' acts and declarations are reliable enough to be competent evidence against each other in a criminal prosecution (Note, *Developments in the Law—Criminal Conspiracy* (1959) 72 Harv.L.Rev. 920, 985, fn. 488). The other rationale asserts that conspirators are each other's agents; when acting for divergent goals, however, the agency relationship cannot be assumed (*id.* at pp. 988-989; Levie, *supra,* 52 Mich.L.Rev. 1159, 1164-1165). Extending the conspiracy in the instant case until one conspirator pays the others for their participation defeats both justifications for the hearsay exception and opens the door to a flood of evidence the reliability of which is at most dubious. Neither the majority nor the People cite, nor has my independent research disclosed, any reported California decision so extending a conspiracy.

In sum, I believe that the majority draw an irrational line by considering that the conspiracy continues for the purpose of Evidence Code section 1223 until fulfillment of the promise which concededly induced some of the participants to enter into the conspiracy, but which was not its common goal. The rationale behind the United States Supreme Court's decision in *Krulewitch* v. *United States, supra,* 336 U.S. 440, which the majority embrace in dealing with the recordings sought to be admitted, applies equally to the conversation. It is the objective of the conspiracy as an entity, not the individual motives of its members, which defines its temporal limits.

I am of the opinion that the statements of Carnes and Jurgenson are not admissible on retrial.[2]

---

[2]While I agree with the majority that the recordings made on September 18 and 19, over three weeks after the murder, were inadmissible, I do not adopt that portion of their reasoning which derives and draws support from their conclusion as to the Carnes-Jurgenson statements.