STATE of Minnesota, Respondent,

v.

Chris N. MILLER, Appellant.

No. 81–209.

Supreme Court of Minnesota.

Feb. 19, 1982.

C. Paul Jones, Public Defender, and Kathy King, Asst. Public Defender, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., St. Paul, Thomas L. Johnson, County Atty., Vernon E. Bergstrom, Chief, Appellate Section, Michael McGlennen, Thomas A. Weist and Anne E. Peek, Asst. County Attys., Minneapolis, for respondent.

## OPINION

ROGOSHESKE, Justice.[*]

This criminal appeal presents a number of issues, the main one involving the scope of *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), which held that, absent exigent circumstances or consent, police without an arrest warrant may not cross the threshold and enter a suspect's residence to arrest him.

This prosecution in district court arose from defendant's kidnapping of two women, one of whom he raped, both of whom he robbed. After the trial court denied defendant's motion to suppress, defendant waived his right to a jury trial and agreed to let the trial court determine his guilt on the basis of stipulated facts, thereby preserving his right to raise the issues on appeal without putting the state and himself through the expense and time of a trial.[1] The trial court found him guilty of all the charges, two counts of kidnapping, two counts of aggravated robbery, and one count of criminal sexual conduct in the first degree, and sentenced him, according to the Sentencing Guidelines, to consecutive terms of 65 months for the sex offense and 21 months for one of the two kidnappings. Issues raised by defendant relate primarily to the denial of his motion to suppress, which raised a number of issues which defendant again raises in this court, but defendant also contends that he was denied a fair trial because the trial court received a presentence investigation report before formally finding defendant guilty of all the charges. The key issue involves the legality under *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), of defendant's post-*Payton* warrantless arrest in the threshold of the front door of his girlfriend's house. Because we might thereby avoid the necessity of deciding this difficult issue, we remand for a hearing to determine whether the confession obtained following the arrest was a fruit of that arrest.

There were three victims but the charges based on defendant's conduct against one of the victims was dropped after she expressed an unwillingness to testify. The incident involving that victim occurred on Tuesday, May 27, 1980, at 1 a.m., when a man wielding a knife forced his way into the victim's car in the parking lot at the Iron Horse Bar at 57th and Lakeland in Crystal after she refused his request that he give her a ride to 63rd Avenue North. After forcing his way in, the man took the victim to a wooded area in Maple Grove near County Road 61 and Freeway 694. There he tied her to a tree, removed her clothes, and forced her to submit to sexual intercourse with him. Afterward he talked of

---

[*] Retired Justice acting pursuant to Minn.Stat. § 2.724.

1. We approved this procedure in *State v. Lothenbach*, 296 N.W.2d 854 (Minn.1980).

putting her in the trunk, then decided against it, making her lie in the back seat instead. After taking a number of items including cash from the victim, the man drove to 47th and Vera Cruz Avenue North in Crystal, where, before leaving on foot, he threatened to retaliate if she ever told anyone what happened. Notwithstanding the threat, the victim did report the matter to the police and did provide the police with a description of the man.

Two weeks later, on Tuesday, June 10, at 1:30 a.m., two women who had been listening to a friend perform at Mr. Bob's at 60th and Lakeland in Crystal, just 3 blocks from the Iron Horse, were sitting in their car looking at a map in the lot when a man with a large dark revolver got in and, after pulling a grey and red ski mask over his face, forced the two to drive to the same place where the other victim had been raped. On the way the man fired the gun into the floor once and asked one of the two women if she wanted a bullet in her head. Once at the scene the man put one of the two women in the trunk, then took the other into the bushes where he made her commit fellatio and submit to cunnilingus and then vaginal intercourse. He then drove them to 694 where, east of Highway 52, he stopped and fled on foot after taking personal property from them. The two women contacted the police immediately, told what had happened, and described the man. Their descriptions were similar to that given by the earlier victim but contained significant new details, including that the man had a distinct cleft in his chin, that he had worn beige gloves and a shirt with the print of two feet on it, that he had refused an offer of a cigarette, and that he claimed to have spent 3 years in Vietnam, part of that time in the jungle.

Late the following Monday night and early Tuesday morning, June 16 and 17, two Crystal police officers, Nygard and Gautsch, wearing street clothes and driving in an unmarked car, kept the lots at the Iron Horse and Mr. Bob's under surveillance hoping to catch the rapist. Early on Tuesday morning they saw defendant walking north on Lakeland by the Iron Horse lot

watching the lot intently. Defendant's general appearance was similar to that of the man which the three women had described. After parking out of sight, Nygard got out and walked southbound so that he could see defendant up close; doing this, he noted that defendant had a definite cleft in his chin and matched the rapist's description extremely closely. After Nygard got back in the car, he and Gautsch saw defendant walk into the back dark area around a furniture store. When defendant came out of this area and saw Nygard and Gautsch again, he starting running. Gautsch jumped out and gave chase on foot and Nygard headed defendant off with the car.

Gautsch eventually caught defendant and identified himself, as did Nygard. After frisking defendant and having him identify himself and give his address (6125 65th Avenue North in Brooklyn Park), the officers told defendant he was not under arrest and was free to leave but they asked him if he would voluntarily talk with them in the car. Defendant agreed and, sitting in the back seat with the door open, said that he had no driver's license, that he was walking home, and that he had not done anything wrong. The officers told him they had had troubles in the area and although he did not have to, they would like him to come into the station voluntarily and have his picture taken. They added that it would only take a few minutes and that they would give him a ride home afterward. Defendant said his photograph was available at the Anoka Police Department, which had arrested him recently on a charge of unauthorized use of a motor vehicle, but the officers told him that it would be easier for them and would save them time to take a new one and so defendant agreed.

When the officers completed taking the pictures, defendant said he would rather be let off at his girlfriend's place, at 4034 Lakeview in Robbinsdale, and so that was where the officers took him. On the way, one of the officers offered defendant a cigarette, but he said he did not smoke. One of them asked if he had ever been in the military, and defendant said he had been in

Vietnam for 3½ years, part of it in the jungle.

After dropping defendant off, the officers spent the rest of the night preparing an affidavit and application for a search warrant to search defendant's apartment at 6121 65th Avenue North. In addition to the information mentioned, including defendant's appearance and the things he said, the officers relied on the fact that defendant's residence, which they had verified, was just 2 to 3 blocks from where the rapist had gotten out of the car of the last two victims, and the fact that defendant's girlfriend's residence was just 8 to 10 blocks from the place where the rapist had fled on foot from the car of the first victim.

A judge signed the warrant at 7 a.m. and it was executed at 8 a.m. Neither defendant nor his sister, with whom defendant lived, was home to answer the officers' knocks, and the officers were unable to locate the manager or caretaker of the building. Finally the officers kicked the door in. Inside they found numerous incriminating items, including a grey and red ski mask, a silver dagger and cash, a blue .357 magnum revolver with five unfired rounds and one spent round in the cylinder, three stag horn hunting knives, beige gloves, a black sweater with footprints like those described by one of the last two victims, and other items.

The officers, without an arrest or search warrant, then went to defendant's girlfriend's place at 4034 Lakeview in Robbinsdale and around 10 a.m. sent a plain clothes officer, Officer Peterson, to the door.

Parenthetically, this residence technically is not defendant's girlfriend's house; rather, it is the house owned by her mother and stepfather. Defendant apparently frequently stayed there, perhaps two nights a week, when her stepfather was out of town. On the night in question both parents were out of town and she and defendant were there alone. At about 6 a.m. defendant's sister, with whom he lived in the apartment, came and dropped off her 5-year-old girl before going to work.

The evidence established that defendant heard the knocking on the door and, wearing pajamas, responded to it by getting out of bed, looking out the window first, and seeing a man there, then opening the door. The state's witnesses testified that Officer Peterson never entered the house or went beyond the threshold but, with one hand holding a gun, grabbed defendant with his other hand as defendant stood in the doorway and placed him under arrest and handcuffed him. Defendant's version and that of his girlfriend was that they pushed him up against the wall in the inside entryway. State's witnesses testified that no police went into the house, but there is some indication that defendant may have been permitted to change clothes after he was arrested, with an officer waiting in the inside entryway. Defendant, however, claimed he was not permitted to change until he was being questioned at the station and after he said he would talk.

Defendant was given a *Miranda* warning in the car on the way to the station. Gautsch talked with defendant at the station first but defendant denied his guilt. Then Nygard, after giving defendant a *Miranda* warning and obtaining a waiver, questioned defendant. Nygard did not threaten defendant or make any promises of no prosecution but did say that whoever did the act in question was a sick man who needed help and that if defendant did it he would try to see that defendant got psychiatric help. Defendant then broke down, began weeping and confessed his guilt of all three crimes. Shortly thereafter, Nygard turned on the tape recorder, readvised defendant of his rights, and got a complete statement, which was reduced to typewriting. Defendant spent 20 to 30 minutes reading it, said it appeared to be correct, then signed it.

At the omnibus hearing defense counsel sought to suppress the items seized in the search of defendant's residence on the ground that (a) defendant was already under arrest when the police questioned him after they stopped him by the lot and that therefore a *Miranda* warning should have

been given; (b) that the search warrant application failed to establish probable cause; and (c) that the manner of execution of the search warrant violated the fourth amendment. Defense counsel challenged the confession on the grounds that (a) the arrest at the house of his girlfriend, like the search of defendant's residence, was a fruit of the earlier illegal interrogation; (b) the arrest was made after an illegal warrantless entry of a residence; (c) the police questioned defendant even though he asked to talk to an attorney; and (d) the confession was involuntary. The state argued chronologically that (a) the stop of defendant was proper in order to obtain his identification; (b) defendant voluntarily agreed to talk with them and that therefore his freedom of action was not restrained and no *Miranda* warning was required; (c) the search warrant application established probable cause; (d) the warrant was executed properly; and (e) the arrest did not violate *Payton* because the house was not defendant's house, there were exigent circumstances, and a violation of *Payton* would not require a suppression of a confession.

The district court said that the only issue which was troubling was the *Payton* issue but that *Payton* did not apply because the house entered was not defendant's house, only his girlfriend's house, and that in any event there were exigent circumstances in that defendant might have learned of the search of his apartment and fled in the time that the police were obtaining an arrest warrant.

On appeal defendant has limited the suppression issues to (a) was the questioning of defendant after he was stopped illegal; (b) was *Payton* violated; and (c) was the confession involuntary?

The fourth issue relates to the fact that the trial court apparently received a presentence investigation report before formally finding defendant guilty of the two aggravated robbery charges. After the attorneys made their final arguments, the trial court stated that it would take the matter under advisement for a week. Defense counsel then asked if it was not possible to start the presentence investigation since it was clear defendant was probably going to be found guilty of something, the idea being that this would cut a week off defendant's jail time. The trial court agreed, stating that the only issue was defendant's guilt of the aggravated robbery charges. Following this plan, the trial court made findings of guilt as to three of the charges and ordered the presentence investigation to be conducted and the report prepared and given to him on a certain date, at which time the court would make a decision on the robbery charges and sentence defendant. The parties agreed with this, and on the date in question the trial court announced that it was also finding defendant guilty of the robbery charges. The trial court apparently already had read the presentence investigation report at the time the findings were announced. After announcing the findings the trial court proceeded with sentencing.

This appeal followed.

The key issue of the constitutional issues relating to the police investigation, arrest, and interrogation of defendant is the *Payton* issue. Before addressing that issue, we shall address the other constitutional issues, namely, the legality of the questioning of defendant after stopping him for identification and the voluntariness of defendant's confession at the station after his arrest.

■ (a) The first of these issues is the issue of the legality of the questioning of defendant after stopping him for identification. The stop was a reasonable stop. The police needed articulable suspicion and they had that because defendant not only fit the description of the rapist but he was on foot and was peering suspiciously into the lot from which one of the victims had been abducted. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). If after learning defendant's identity and address the police had not made it clear to him that he was free to leave, then we *might* have to hold that the police had to give defendant a *Miranda* warning before questioning him. However, since the police told defendant he was not under arrest and that he was free

to leave, defendant's decision to talk and his decision to be photographed were voluntary decisions on his part, and neither the requirements of probable cause nor the giving of a *Miranda* warning was applicable. In this respect, the case is like *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977), where the United States Supreme Court upheld the interrogation of a suspect at the police station without a *Miranda* warning being given where it was clear that the suspect voluntarily came to the station to talk with the police at their request knowing he did not have to do so.

■ (b) The next issue is the voluntariness of the confession. The record showed that defendant had only an eighth grade education, but, on the other hand, it showed that he had enlisted in the Navy and passed the basic enlistment requirements. While the officers did mention that they would try to get psychiatric help for defendant if he was the one who did it, they did not promise defendant that he would not be prosecuted, and the record suggests that the officers were not lying when they said they would try to help him. For a summary of the law bearing on voluntariness of confessions, *see State v. Linder*, 268 N.W.2d 734 (Minn. 1978). The short of it is that the court is to look at the totality of the circumstances to determine if the confession was voluntary. In this case we hold that, based on the facts as found by the trial court, the confession was voluntary.

(c) The more difficult issue is the *Payton* issue.

As we indicated, *Payton* held that the fourth amendment prohibits police, absent exigent circumstances or consent, from making a warrantless entry—that is, crossing of the threshold—into a suspect's residence in order to make a felony arrest.

One issue not addressed in *Payton*—entry of a third person's house to arrest a person not the resident of the house—was addressed recently in *Steagald v. United States*, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981), with the Court affirming a holding that, under the fourth amendment, a law enforcement officer may not legally search for the subject of an arrest warrant in the house of a third person without first obtaining a search warrant. What happened in *Steagald* is that the police, armed with a fugitive warrant to arrest one Lyons, nonconsensually and without exigent circumstances entered Steagald's house without a search warrant after obtaining probable cause to believe that Lyons would be found there. They did not find Lyons, but in the search they found cocaine, and Steagald was arrested and convicted on federal drug charges. The precise holding of the *Steagald* case was that the evidence discovered in the search had to be suppressed in the prosecution of Steagald because, although the police had an arrest warrant and therefore could have entered Lyons's home without a warrant, the home was not Lyons's home but Steagald's and a search warrant was needed to search for Lyons in Steagald's home. Justice Rehnquist dissented but added that he did not believe the effect of the decision would be major because (a) if a suspect has been living in a dwelling for any significant period, even a few days, it could be considered his "home" for fourth amendment purposes and therefore a search warrant would not be needed, only an arrest warrant, and (b) on the other hand, the more fleeting a suspect's connection with the premises the more likely that exigent circumstances would exist to justify immediate warrantless entry to arrest the fugitive.

In this case if it was defendant's home, or if he had a reasonable expectation of privacy in it given him by a person authorized to do so (in other words, his girlfriend), then an arrest warrant would have been needed to make a warrantless nonconsensual, nonexigent entry to arrest defendant. On the other hand, if it was not defendant's "home" for fourth amendment purposes, then as an abstract matter a search warrant would have had to have been obtained to make a nonconsensual, nonexigent entry to arrest defendant; however, as a practical matter, if it was not defendant's home, then arguably only the girlfriend and her parents would have had standing to complain

about the entry, not defendant, although this is not stated in *Steagald.*

If the defendant did have a reasonable expectation of privacy, if only temporarily, in the residence—and it appears even Justice Rehnquist, who dissented in *Steagald*, might be inclined to say that he did—then we are faced with a number of other issues left undecided in *Payton* and *Steagald.* The first of these is what constitutes exigent circumstances in this context. The district court based its decision in part on the ground that there were exigent circumstances. For a discussion of what circumstances constitute exigent circumstances in this context, *see* W. Donnino and A. Girese, *Exigent Circumstances for a Warrantless Home Arrest*, 45 Albany L.Rev. 90 (1980). We believe that the exigency issue is a difficult one. Police officers testifying at the omnibus hearing claimed they feared that defendant would learn that his apartment had been searched from personally finding that it had been searched or as a result of being told this by his sister or a neighbor and that he would then flee the jurisdiction before the police could arrest him. The trouble with this argument is that in order to get probable cause to search defendant's apartment, the police had to have probable cause to believe that defendant had committed the crimes in question; otherwise, there would have been no reason to believe his apartment contained evidence. This being so, there was no reason that police could not have obtained an arrest warrant at the same time they obtained the search warrant. It is questionable whether the United States Supreme Court would hold that the police have exigent circumstances when the need for proceeding without a warrant is prompted by the police's lack of foresight. Further, in this case it is questionable whether the real reason the police did not get an arrest warrant was as they said: Detective Gautsch testified that he did not know "if such a thing as an arrest warrant exists."

Another issue left undecided in *Payton* is what effect *Payton* has on cases which, relying on *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976), uphold nonexigent warrantless arrests initiated at the threshold when a suspect voluntarily opens the door. In the *Santana* case police, who had probable cause to believe that Santana had in her possession marked money which had been used to make a heroin buy arranged by an undercover agent, went to her house, where they saw her standing in the open doorway holding a paper bag. After shouting "police" and displaying their badges, they approached but Santana retreated into the vestibule. The officers followed through the open door, catching and arresting her in the vestibule, seizing the bag, which contained heroin, and the marked money from her pockets. Reversing a decision of the Court of Appeals which upheld a district court ruling which suppressed the evidence, the United States Supreme Court, citing *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976)—which upheld the nonexigent warrantless arrest of an individual in a public place upon probable cause—concluded that Santana was in a "public" place when she stood in the open doorway of her house:

> While it may be true that under the common law of property the threshold of one's dwelling is "private," as is the yard surrounding the house, it is nonetheless clear that under the cases interpreting the Fourth Amendment Santana was in a "public" place. She was not in an area where she had any expectation of privacy. "What a person knowingly exposes to the public, even in his own house or office, is not a subject of Fourth Amendment protection." *Katz v. United States*, 389 U.S. 347, 351 [88 S.Ct. 507, 511, 19 L.Ed.2d 576] (1967). She was not merely visible to the public but was as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house. *Hester v. United States*, 265 U.S. 57, 59 [,44 S.Ct. 445, 446, 68 L.Ed.2d 898] (1924). Thus, when the police, who concededly had probable cause to do so, sought to arrest her, they merely intended to perform a function which we approved in *Watson.* 427 U.S. at 42–43, 96 S.Ct. 820 at 36, 37, 416 L.Ed.2d 598.

Concluding that Santana could not defeat the arrest, which had been set in motion in a public place, by retreating into a private place, the Court reversed the judgment of the Court of Appeals.

One lower court case which relied upon *Santana* and upheld a nonexigent warrantless arrest initiated at the threshold when a suspect voluntarily opened the door to police knocking was *United States v. Botero*, 589 F.2d 430 (9th Cir. 1978), *cert. denied*, 441 U.S. 944, 99 S.Ct. 2162, 60 L.Ed.2d 1045 (1979). The same court that decided *Botero* —a court which adopted a *Payton*-type rule in advance of the *Payton* holding—suggested in *United States v. Johnson*, 626 F.2d 753 (9th Cir. 1980), *cert. granted*, —— U.S. ——, 102 S.Ct. 563, 70 L.Ed.2d 472 (1981), that *Santana* and *Botero* still have vitality. The court in *Johnson* seemed to be of the view that nonexigent warrantless arrests initiated at the threshold may be valid but only if the suspect's initial act of exposing himself to the view and physical control of the police by opening his door is consensual, as by voluntarily opening the door when he knows that the police are knocking, not when the police use deception or subterfuge to get him to open the door.

We believe that the United States Supreme Court will uphold nonexigent warrantless arrests initiated at the threshold of a suspect's house where the suspect voluntarily opens the door in response to knocking.

Whether or not the use of deception and disguise should be ruled out in the *Payton* context and whether or not it is deceptive for a plainclothes policeman to knock on the door of a suspect's house are issues which the United States Supreme Court will also ultimately have to decide. Any decision approving the use of deception and disguise would probably rely on *Osborn v. United States*, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966), *Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374

(1966), and *Lewis v. United States*, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966)—the so-called *Hoffa* trilogy—which approved the use of deception in police investigation under certain circumstances.[2] This trio of cases was relied upon by this court in *State v. Buchwald*, 293 Minn. 74, 196 N.W.2d 445 (1972), which upheld the use of a ruse by police to get a man whom they suspected of having contributed to the delinquency of minor girls to open the door to his hotel room. On the other hand, there are strong arguments which can be made against the use of deception by police. *See for example*, Weinreb, *Generalities of the Fourth Amendment*, 42 U.Chi.L.Rev. 47, 66–67 (1974).

■ In this case a plainclothes officer went to the door and knocked, and defendant opened the door. Whether this constitutes deception on the part of the police and, if so, whether that rendered illegal any warrantless arrest of defendant initiated at the threshold are issues which we have concluded need not be decided at this time because it is reasonably possible that the confession was in reality the product of the earlier search of the apartment, not the arrest, something which would obviate the need for us to decide the arrest issue. Cases setting forth the test for determining whether a confession was the suppressible product of an illegal arrest include *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1980), and *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). For a full discussion of the application of the rule of these cases in the context of an illegal arrest under *Payton, see United States v. Johnson*, 626 F.2d 753 (9th Cir. 1980), *cert. granted*, —— U.S. ——, 102 S.Ct. 563, 70 L.Ed.2d 472 (1981). A key factor is whether the illegality may be said to have caused the suspect to give the statement. Our examination of the record of the omnibus hearing and the transcript of defendant's confession fails to re-

**2.** The *Hoffa* case approved the use of undercover agents to obtain incriminating statements from Hoffa before commencement of prosecution. Hoffa should be compared with *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183,

65 L.Ed.2d 115 (1980), which disapproved of hiring of a cellmate of an indicted defendant to obtain incriminating statements from the defendant.

veal whether the police told defendant that they had searched the apartment before they questioned him. If they did, then it is likely that defendant's knowledge of the results of the lawful search of his apartment and not any illegality in arresting him without a warrant caused him to confess. On remand the trial court should conduct a factfinding hearing focusing on this issue.[3]

■ 2. The only other issue is whether defendant was denied a fair trial by the fact that the trial court apparently received and read the presentence investigation report before announcing the finding of guilty of the two robbery charges. We agree that normally such a procedure would not be proper, but the record demonstrates sufficiently that this procedure was followed at defense counsel's request and without objection. Therefore, defendant must be deemed to have forfeited the issue.

Remanded.

KELLEY, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

---

**3.** Another alternative to deciding the arrest issue would be to hold that the admission of the confession was harmless error beyond a reasonable doubt. Even taking into account the fact that the United States Supreme Court in recent cases appears to have endorsed a "practical, less-than-literal application of the rule," *Watts v. State*, 305 N.W.2d 860, 862 (Minn. 1981), we have doubts about the soundness of such a ruling in this case because the case was tried on stipulated facts, without any testimony by the victims identifying defendant or any of the objects found in his apartment, and it seems highly likely that the confession played a significant role in influencing the court to find defendant guilty.