STATE of Minnesota, Respondent,

v.

Donald Wayne HOWARD, Appellant.

Nos. 48620, 81–735.

Supreme Court of Minnesota.

Aug. 31, 1982.

Rehearing Denied Oct. 4, 1982.

Douglas W. Thomson and Robert D. Goodell, St. Paul, for appellant.

Warren Spannaus, Atty. Gen., and Gary Hansen, Sp. Asst. Atty. Gen., St. Paul, Julius Gernes, County Atty., Winona, for respondent.

SCOTT, Justice.

This is an appeal of the partial denial of post-conviction relief in the case of the conviction of appellant for murder in the first degree. The trial judge denied in part the petition for post-conviction relief. The conspiracy-to-commit-murder conviction was vacated as a lesser-included offense. *See* Minn. Stat. § 609.04 (1980).

This is the second time we have been asked to review the conviction of a defendant charged in the killing of Shirleen Howard. The first occasion is set out in *State v. Webber,* 292 N.W.2d 5 (Minn. 1980), wherein we upheld the conviction of Bruce Webber. In this case we affirm the conviction of the man accused of hiring Bruce Webber to kill Shirleen Howard.

Shirleen Howard's body was discovered by her husband, the appellant Donald Howard (hereafter Howard), on Saturday, August 13, 1977, at approximately 9:15–9:20 p.m. in the basement of the Howard home. Mrs. Howard was found with two gunshot wounds in her head, and she had just been shot. Nothing in the home was disturbed or missing. Bruce Webber was convicted of committing the murder, and Howard was convicted of first degree murder for hiring Webber to do the killing.

After discovering his wife's body, Howard took his children to the next-door neighbor's home, and the police were called. The police arrived at 9:23 and began searching for clues. A .45 caliber bullet and a .45 caliber casing were found near the body. The rest of the home was searched, and some articles and pamphlets on the subject of marital difficulties were found in the master bedroom. Two days later the police returned to the scene and appellant assisted the officers in their investigation.

The prosecution's firearms identification expert concluded that the bullets found at the crime scene were in all likelihood fired from a Llama firearm. Gun records from Howard's Coast to Coast store indicated that five guns, including a .45 Llama, were transferred to Webber.

The day after the killing a friend of Howard, Charles Murphy, called police, and on Monday, spoke to them. Murphy testified at trial that he described to police how in August 1976 Howard had offered him a total of $4,000 to kill Shirleen Howard. Murphy refused, but over a period of months Howard sent Murphy messages that could be interpreted as renewals of his original request to Murphy.

Police learned of another individual whom Howard contacted for the purpose of killing his wife. Police contacted Raymond Riniker, a former classmate of Howard, and met with him on August 18, 1977. Riniker also related conversations with Howard where he was offered money to kill Howard's wife. Howard gave Riniker $1,000 and offered to supply a gun. In March of 1977 Riniker called Howard to tell him he had changed his mind.

Riniker further testified that he stopped by Howard's store in the summer of 1977 and observed Howard meeting with a third party. After the third person left, Riniker asked Howard if that was the individual who was supposed to kill his wife. Howard said he had paid the man, a resident of Joliet, Illinois (Webber's residence), $2,000, and had given him an archery bow and a gun. In the course of their investigation the police established through telephone records that numerous phone calls were placed from Howard's store and home to Webber's home prior to Howard's arrest. As late as August 7, Howard offered Riniker a motorhome as payment for the killing.

On August 23, 1977, arrangements were made to monitor a telephone conversation between Riniker and Howard. A meeting was arranged for later that day, and Riniker consented to allow police to bug the conversation. Police then stationed themselves outside the Howard home where they

listened to the conversation. Howard told Riniker:

> Butch, don't worry * * *. Listen, let me tell you what happened. This guy—I told you he had backed off. He didn't seem to want to do it. He called me up and he said, "Do you still want to do that?" and I said, "Yeah." I said O.K. I come home and that's what I found. He was planning an accident, it was supposed to be an accident. I was so God damn mad—and it was gruesome.

After Riniker left, police arrested Howard. Police advised Howard of his rights, but he did talk with officers, essentially denying any complicity in the killing. The following day, August 24, police questioned Howard again, and during that conversation he confessed. He admitted paying Webber $2,000 and merchandise. He also disclosed that on the preceding morning he had mailed Webber a certified package containing $1,500 and a diamond ring.

Webber was arrested on August 26 in Joliet, Illinois, just after he received the package containing the money and ring sent by Howard. Subsequent investigation revealed several personal contacts between Webber and Howard, including a meeting on August 12, 1977, the day before the murder.

Near the end of October, 1977, Howard escaped from the Winona County Jail. He was apprehended with Nancy Brown in Louisiana on October 31, 1977.

Howard took the stand and denied hiring Webber. His defense was that his conversations with Murphy and Riniker concerning killing Shirleen Howard were conducted in jest. The same reasoning applied, Howard testified, to his conversations with Jerry Sorenson where the topic of killing his wife arose. He testified that the ring and money were sent to Webber because Webber had threatened him. He explained his admissions to police as fabrications motivated by a desire to keep Webber off the streets and away from his family.

This appeal presents the following issues for resolution:

(1) Whether appellant was denied his due-process right to a fair and impartial jury; (2) whether the use of appellant's statements against him at his trial violated his right under the Fifth and Fourteenth Amendments to have counsel present during custodial interrogation; (3) whether the statements made by appellant's codefendant after the murder were properly admitted; (4) whether the evidence seized during a search of appellant's home on the night of the murder violated appellant's Fourth Amendment rights; and (5) whether the taped conversation between appellant and Raymond Riniker was properly admitted.

1. Appellant requests a new trial because some members of his jury were aware that his codefendant, Bruce Webber, had already been convicted of the murder of Shirleen Howard. Appellant contends that this knowledge prevented the jurors from presuming appellant's innocence because the conviction of the codefendant inescapably invited the jury to believe that Webber's guilt implied appellant's guilt. Respondent urges this court to deny appellant's request, and argues that there was no showing of partiality by the jury or, alternatively, that appellant waived his right to object to the seating of jurors who had been exposed to pretrial publicity.

The voir dire process consumed six and one-half trial days, during which time fifty-one jurors were examined. Each of the jurors and alternates who indicated that they had knowledge of Webber's conviction testified that their knowledge would not influence their decision in appellant's case. Respondent points out that appellant passed most of the jurors who possessed what he now regards as patently prejudicial information without challenging for cause or exercising a peremptory challenge. In the case, for example, of the fourth prospective juror, the fact of the prior conviction was revealed by appellant's attorney and the juror was accepted by appellant.

In *State v. Krampotich*, 282 Minn. 182, 163 N.W.2d 772 (1968), this court found a waiver of the right to challenge a jury panel where that panel was aware of a

related prior conviction. However, *Krampotich* is not quite as close an analogy as respondent suggests. Appellant in this case made several motions prior to the final impanelment of the jury to have all those with knowledge of the Webber conviction struck for cause. Counsel in *Krampotich* deliberately sought to seat the jurors who had found favorably in an earlier trial on his case; therefore, the waiver was much clearer.

■ Assuming, arguendo, that there was no waiver, appellant still falls short of establishing that the jury was predisposed to convict. In *State v. Beier*, 263 N.W.2d 622 (Minn. 1978), this court said:

> In order to successfully challenge a juror for cause under Rule 26.02, subd. 5, in a case involving pretrial publicity, the defendant must do more than elicit an admission from the potential juror that he has been exposed to pretrial publicity. The test is whether the potential juror exposed to such publicity demonstrates to the satisfaction of the court that he can set aside preconceptions and render an impartial verdict.

*Id.* at 626. *Cf. State v. Webber*, 292 N.W.2d 5, 12 (Minn. 1980) (pretrial publicity as it affects venue). In this case the jurors were repeatedly tested and admonished concerning their impartiality. It was noted in *Beier*, 263 N.W.2d at 627, that "[s]ince the trial court heard the testimony of the three jurors and observed their demeanor, he was in a better position than we are to decide whether they were telling the truth when they testified that their knowledge of the other charges had not affected their thinking."

■ Appellant's citation to *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), is not helpful to his argument because the egregious facts of *Irvin* (eight of the twelve jurors believed the accused was guilty) stand in sharp contrast to this case. If, as here, the jurors indicate their intention to set aside any preconceived notions, and demonstrate to the satisfaction of the trial judge that they are able to do so, this court will not lightly substitute its own

judgment. *See United States v. Radetsky*, 535 F.2d 556 (10th Cir. 1976), *cert. denied* 429 U.S. 820, 97 S.Ct. 68, 50 L.Ed.2d 81 (1976).

2. The issue concerning whether the use of appellant's statements against him at his trial violated his right under the Fifth and Fourteenth Amendments to have counsel present during custodial interrogation is the most difficult issue presented by the appeal. On August 23, 1977, when appellant was arrested, Officer Rysavy questioned him concerning the homicide. Appellant was evasive, and made no admissions concerning any involvement on his part in the killing of his wife. Near the end of the August 23 conversation the police revealed that they had recorded appellant's conversation with Raymond Riniker just prior to his arrest. In that conversation appellant had implicated himself in the homicide.

Following the revelation of the recorded conversation appellant refused to talk further. The relevant portion of the transcript is set out below:

> DH: I can't tell you any more.
>
> RWR: You can't or you won't?
>
> DH: I can't—'cause I don't know actually who done it.
>
> RWR: Tell me what transpired. You realize if you tell me the whole store [sic] you're going to involve yourself all the more. I told you the evidence that we've accumulated and I think you'll agree that we've done fairly good.
>
> DH: I don't think I better say anymore—till I have an attorney.
>
> RWR: Do you want to end our conversation now?
>
> DH: I'll talk as long as you want to, but
>
> * * *
>
> RWR: Well, you just said you didn't want to say anymore till you had an attorney.
>
> DH: Well I guess I won't make any conversation.
>
> RWR: Do you recall when we first started and I advised you of your rights, the last thing I said to you—we could stop talking at anytime during our conversa-

tion if you'd just say so. Is this that time?

DH: I guess so, yeah.

RWR: You think it is. You want to think on it. All right, Don, not just so that I have the last word or anything—do you feel that I've lied to you at anytime during our conversation?

DH: I think you're guessing.

After some further comments by the officer concerning the strength of their evidence, the interrogation of appellant ceased.

The next day, August 24, two officers went to appellant's cell. One of the officers testified at the omnibus hearing that:

> I explained that I was very interested in getting more information in regard to the person that actually pulled the trigger, that I was personally concerned and our investigation was concerned that this person was still on the loose somewhere and that I was concerned with the safety and security of his children and his family, and the officers involved in the investigation, the witnesses involved in the investigation, and ask[ed] that hopefully he would be willing to give us some information to assist in the investigation.

At that point appellant agreed to participate in a tape-recorded question-and-answer session. Officer Rysavy asked the questions and began by reviewing appellant's Miranda rights.

> Rysavy: * * * Do you understand all of those, Don?
>
> Howard: Yeah, why don't I have an attorney here now?
>
> Rysavy: Why don't you? Ah, would you rather have one present during our questioning?
>
> Howard: Well, ah, no I guess not, * * *.

At trial appellant testified that he did not think he needed an attorney at the time he was questioned on August 24. During this interview appellant admitted hiring Webber to kill his wife. He also discussed his moti-

vation for procuring the killing. He described sending Webber $1,500 and a diamond ring wrapped in a magazine. This information led police to intercept the package and time their arrest of Webber accordingly. Howard also admitted giving Webber guns and other merchandise.

■ Appellant strenuously argues that all of the statements made during the August 24 interview must be suppressed because there was no valid waiver on his part of the right to counsel which he had invoked on the previous day.[1] Resolution of this question turns on interpretation of the United States Supreme Court's recent decision in *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and the application of the *Edwards* holding to the facts of this case.

One sub-issue can be quickly resolved. Both parties expend considerable effort briefing the question of the retroactivity of *Edwards.* In a recent opinion, *State v. Brown,* 317 N.W.2d 714 (Minn. 1982), this court unequivocally declared that *Edwards* is not to be given only prospective application, because the case merely confirms *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

*Edwards* told police on day one that he "want[ed] an attorney before making a deal," and then was taken to jail. On the morning of day two detectives came to see *Edwards* and asked to talk to him. A detention officer informed *Edwards* that the detectives wished to talk to him, to which *Edwards* replied that he did not want to talk to anyone. "The guard told him that 'he had' to talk and then took him to meet with the detectives." *Edwards* 451 U.S. at 479, 101 S.Ct. at 1882. *Edwards* then talked to police and implicated himself in the crime in question.

The Arizona Supreme Court found *Edwards* to have waived his right to remain

---

1. Appellant also suggests that there was improper delay in presenting him to a magistrate after his arrest. This contention has no merit. Minn. R. Crim. P. 4.02, subd. 5(1), requires presentation no later than 36 hours after arrest.

Appellant was presented within 12 hours of his arrest. That delay was reasonable in view of the fact that the prosecutor had to draft and prepare two murder complaints.

silent and have counsel present during custodial interrogation. In reversing, the United States Supreme Court noted that "although we have held that after initially being advised of his *Miranda* rights, the accused may himself validly waive his rights and respond to interrogation, * * *, the Court has strongly indicated that additional safeguards are necessary when the accused asks for counsel." *Id.* 451 U.S. at 484, 101 S.Ct. at 1884. The Court then described two additional safeguards, with one delineated as follows:

> We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

*Id.* at 484–85, 101 S.Ct. at 1884–85.

Respondent acknowledges that "clearly, then *Edwards* stated a new rule," that rule being that once the right to counsel has been invoked, a waiver of that right can only occur at the initiation of the holder of the right. In this case, Officer Siebert urged appellant to talk in the interests of protecting the safety and security of his children, family, the police officers, and witnesses. The meeting and conversation was not initiated by appellant and, therefore, was in violation of *Edwards* if the appellant had "expressed his desire to deal with the police only through counsel" the night before. *Edwards* at 484, 101 S.Ct. at 1884.

■ Respondent contends that appellant did not clearly assert his right to counsel nor did he express a desire to deal with police only through counsel. We agree. In response to Officer Rysavy's specific question on August 24, appellant stated that he "guessed" that he did not want an attorney present. He also confirmed during direct examination at trial that he didn't believe he needed an attorney present on the 24th. Appellant's request for counsel was not the clear, unequivocal kind of request required by *Edwards,* 451 U.S. at 485, 101 S.Ct. at

1885, and recently affirmed by our own case of *Muhammed v. State,* 316 N.W.2d 572 (Minn. 1982).

■ However, even assuming, *arguendo,* that it was error for police to question appellant on August 24 where appellant did not initiate the conversation, it must next be determined whether the error was prejudicial or merely harmless. · We hold that if error was committed, that error was harmless in the context of this case.

The standards for evaluating when a constitutional error may be found harmless have undergone considerable evolution since the mid-1960's. *See* W. LaFave, *Search and Seizure,* § 11.7(e) (1978). It is clear, nonetheless, that except in the rare case, *see Chapman v. California,* 386 U.S. 18, 23 and n. 8, 87 S.Ct. 824, 827 and n. 8, 17 L.Ed.2d 705 (1967), "the question of whether or not a constitutional error was harmless cannot be answered by considering the error in isolation." *Harryman v. Estelle,* 616 F.2d 870, 876 (5th Cir. 1980). " 'It is necessary to review the facts of the case and the evidence adduced at trial' to determine the effect of the unlawfully admitted evidence 'upon the other evidence adduced at trial and upon the conduct of the defense,' " *id.,* quoting *Fahy v. Connecticut,* 375 U.S. 85, 87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963). We have endorsed this approach in *Watts v. State,* 305 N.W.2d 860, 862 (1981) (*overruled in part on other grounds* by *State v. Hatcher,* 322 N.W.2d 210 (Minn. 1982).

In this case, before appellant's statement on August 24 the police had direct evidence of numerous prior attempts by appellant to hire others to kill his wife. Police also had telephone records showing numerous contacts between appellant and Webber. Further, the officers had records of appellant's store's selling several guns, including what was believed to have been the murder weapon, to Webber. Finally, police had a taped conversation between Riniker and appellant where the clear import of appellant's statements was that he had hired someone to kill his wife. In the face of the overwhelming evidence, the discovery that a pay-off had been mailed was a minor

addition to the state's case against appellant.

We recently left open the possibility that an improperly admitted confession might be subject to the harmless error rule, *see State v. Miller,* 316 N.W.2d 23 (Minn. 1982). This is a proper case for the application of that rule.

3. On the morning of August 24, 1977, Joliet, Illinois, police officers Fred Hafner and William Fitzgerald spoke with Bruce Webber in Illinois. This conversation took place after appellant's arrest but before information of his confession reached the officers or Webber. During the conversation Webber gave a number of exculpatory explanations to the officers' questions. These explanations were later disproved at trial. Appellant's counsel objected to the officers' relating Webber's statements at trial, on the basis of hearsay. The trial court properly found the statements not hearsay under Minn. R. Evid. 801(d)(2)(E).

A statement is not hearsay if: "The statement is offered against a party and is * * * a statement made by a coconspirator of a party during the course and in furtherance of the conspiracy." *Id.* Appellant contends that the state failed to show that Webber's statements were made in furtherance of a conspiracy.

■ The exculpatory statements made by Webber were designed to avoid detection of his relationship to appellant and the killing, with the goal, presumably, of insuring that the remaining payment he expected would still be collected. The answers were designed to promote the common good of the conspirators, which meets the broadly construed furtherance requirement. *See United States v. Overshon,* 494 F.2d 894 (8th Cir. 1974). *See also State v. Kidd,* 239 N.W.2d 860 (Iowa 1976).

The next question is whether the statements of Webber were made during the pendency of the conspiracy. The rule expressed in *Krulewitch v. United States,* 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949), is that courts will not find uncharged conspiracies aimed at avoiding detection of a crime already committed in order to permit the use of hearsay statements made by co-conspirators. *Id.* at 444, 69 S.Ct. at 718–19. Respondent argues that there is, however, a substantial body of case law which holds that when an integral act connected with the main objective of the conspiracy remains undone, the conspiracy remains alive.

In support of its position, respondent cites a California case, *People v. Saling,* 7 Cal.3d 844, 103 Cal.Rptr. 698, 500 P.2d 610 (1972). That case presented a murder-for-hire situation analogous to this case, with the state offering statements of a co-conspirator made three days after the murder. The California court admitted the statements, reasoning:

It has long been the law in this state that a conspirator's statements are admissible against his co-conspirator only when made during the conspiracy and in furtherance thereof * * *. The conspiracy usually comes to an end when the substantive crime for which the co-conspirators are being tried is either attained or defeated * * *. It is for the trier of fact—considering the unique circumstances and the nature and purpose of the conspiracy of each case—to determine precisely when the conspiracy has ended * * *. *Particular circumstances may well disclose a situation where the conspiracy will be deemed to have extended beyond the substantive crime to activities contemplated and undertaken by the conspirators in pursuance of the objectives of the conspiracy.* * * *

Clearly the money offered by Murphy for killing his wife motivated defendant and Jerry Carnes to participate in the plan, and the transfer of the money was one of its main objectives as far as defendant and Carnes were concerned. Since payment to either defendant or Carnes had not yet occurred by the time of the conversation between Carnes and Jurgenson only three days after the murder, Jurgenson's statements to Carnes were admissible as being made during the conspiracy.

*Id.* 103 Cal.Rptr. at 703, 500 P.2d at 615 (emphasis added).

The *Saling* position is sensible and we apply it here. A separate concealment conspiracy is not created in contravention of the dictates of *Krulewitch;* instead, there is a recognition that the conspiracy to murder for a fee was as yet uncompleted while part of that fee was traveling through the mails.

4. After appellant discovered his wife's body on the evening of August 13, 1977, he asked his next-door neighbor to call the police. Appellant admitted the police into his home when they arrived and accompanied them on their preliminary search of his basement. Later appellant was asked to leave, and police conducted a search of the entire house. The house was searched and, in a nightstand in the master bedroom, a patriarchal blessing and magazine articles dealing with marital problems were found. These items were sought to be suppressed as the products of a warrantless search that exceeded the proper scope of the search of a murder scene.

Appellant relies on *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) for support. *Mincey* rejected a "murder scene" exception created by the Arizona Supreme Court to the requirement of showing exigent circumstances in order to justify the warrantless search of a home where a homicide has taken place. However, this case is distinguishable from *Mincey* in one critical respect. Appellant consented to this search. He called the police, invited them into his home, and, it may reasonably be inferred from the testimony, expected and desired that the police search for weapons and other evidence.

Appellant, of course, focuses on the scope of his consent, arguing that the consent to search did not include the drawers in the upstairs bedroom. In response, the state takes the position that these articles would have been "inevitably discovered" and therefore excepted from the exclusionary rule. Two days after the body was discovered appellant gave the police a key and open invitation to his home, and on August 24 he signed a consent-to-search form. The "inevitable discovery" rule, *see* LaFave,

*Search and Seizure,* § 11.4 at 620–28 (1978); *see also Clough v. State,* 92 Nev. 603, 555 P.2d 840, 841 (1976), has received mixed reaction. LaFave, *supra.* Some commentators regard the rule as a "valuable, logical and constitutional principle," LaCount & Girese, *The "Inevitable Discovery" Rule, an Evolving Exception to the Constitutional Exclusionary Rule,* 40 Albany L. Rev. 483, 511 (1976), while others suggest that the rule "can only encourage police shortcuts whenever evidence may be more readily obtained by illegal than by legal means," Note, 74 Colum. L. Rev. 88, 99 (1974).

Ultimately, we are not persuaded to reverse on this ground because even if the admission of the evidence was error, that error is harmless. The fact that appellant or his wife had been reading literature on marital difficulties is a relatively insignificant piece of evidence when viewed in the context of the totality of the evidence.

5. Finally, appellant contends that the taped phone conversation between himself and Raymond Riniker should not have been admitted. Appellant recognizes that the law in this state permits police to monitor conversations if one party to the conversation consents. Minn. Stat. § 626A.02, subds. 2(c) and (d) (1980), provides:

(c) It shall not be unlawful under sections 626A.01 to 626A.23 for a person acting under color of law to intercept a wire or, oral communication, where such person is a party to a communication or one of the parties to the communication has given prior consent to such interception.

(d) It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire or oral communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the constitution or laws of the United States or of any state or for the purpose of committing any other injurious act.

Appellant seeks to raise Raymond Riniker's reluctance to aid police in investigating his friend to such a level that he argues that Riniker's misgivings could only have been overcome by improper duress or coercion. The record does not support appellant's position. Our reading of the record leads us to conclude that Riniker's consent appears to have been freely and unequivocally given.

Therefore, for the reasons described above, we affirm the appellant's conviction.

Affirmed.

KELLEY, J., took no part in the consideration or decision of this case.

PETERSON, Justice (concurring specially).

The critical issue in this case is whether a new trial should be ordered on the ground that defendant's right to a fair trial was violated by the admission into evidence of his confession obtained during a custodial police interrogation without the presence of counsel for defendant.

I agree that defendant did not make a clear and unequivocal request for counsel during the initial interrogation on August 23, which preceded the challenged interrogation in the latter part of the morning on August 24. A *reading* of the typewritten transcript of the taped interrogation of August 23 seemingly indicates such request, but *listening* to the garbled tape itself discloses nuances of equivocal hesitation and tone of voice that persuade me otherwise.

The particular point of my separate statement of views is that, notwithstanding the pointed language of Justice White in *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), forbidding police-initiated interrogation subsequent to a request for counsel, the facts of this case are so distinguishable from those in *Edwards* as not to foreclose a valid waiver even were it to be held that Howard had made an unequivocal request for counsel.

In *Edwards,* the defendant during his initial interview at night made an unequivocal request for counsel. On the following morning, at 9:30, the police came to the jail to interrogate him. He again clearly indicated that he did not wish to be interrogated, but the detention officer nonetheless took him to the police, stating that Edwards "had to" talk with the police.

In this case, defendant Howard is in a markedly different posture. Howard was neither unsophisticated nor indigent but was a business man presumably acquainted and accustomed to dealing with lawyers. It appears that he had not used the available opportunity to retain counsel. It is clear from this portion of the trial transcripts that he did not wish counsel:

Q  Turning to August 24th, the day that Mr. Rysavy interviewed you, do you admit or do you deny if you were asked by Mr. Rysavy whether or not you wanted an attorney.

A  He asked me if I wanted an attorney.

Q  Do you admit or deny saying no to him.

A  I didn't think I needed one—no.

The transcript of both police interrogations makes abundantly clear the absence of any coercive atmosphere and, indeed, demonstrates commendable police restraint, bordering on solicitude, in dealing with defendant.

This assessment of the particular facts and circumstances of these interrogations is, except for the aspect of police initiation of the second interrogation, in harmony with the Court's opinion in *Edwards v. Arizona* —at least with the understanding of it as articulated in the concurring opinion of Justice Powell, in which Justice Rehnquist joined. Justice White, in the majority opinion, wrote in part:

It is reasonably clear under our cases that waivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case 'upon the particular facts and circumstances surrounding that case, including

the background, experience, and conduct of the accused.' [Citations omitted.]

451 U.S. at 482–3, 101 S.Ct. at 1883–84.

> [H]owever sound the conclusion of the state courts as to the voluntariness of Edwards' admission may be, neither the trial court nor the Arizona Supreme Court undertook to focus on whether Edwards understood his right to counsel and intelligently and knowingly relinquished it. * * *
>
> [A]lthough we have held that after initially being advised of his *Miranda* rights, the accused may himself validly waive his rights and respond to interrogation [citation omitted], the Court has strongly indicated that additional safeguards are necessary when the accused asks for counsel; and we now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

*Id.* at 484–5, 101 S.Ct. at 1884–85.

Justice Powell concurred in the court's judgment but did not join in the opinion, "because [he was] not sure what it means" (*id.* at 488, 101 S.Ct. at 1887),[1] writing:

> In view of the emphasis placed on 'initiation' [citation omitted], I find the Court's opinion unclear. If read to create a new *per se* rule, requiring a threshold inquiry as to precisely who opened any conversation between an accused and state officials, I cannot agree. * * *

Perhaps the Court's opinion can be read as not departing from established doctrine. Accepting the formulation quoted above, two questions are identifiable: (i) was there in fact 'interrogation' [citation omitted], and (ii) did the police 'initiate' it? Each of these questions is, of course, relevant to the admissibility of a confession. In this case, for example, it is clear that Edwards was taken from his cell against his will and subjected to renewed interrogation. Whether this is described as police-'initiated' interrogation or in some other way, it clearly was questioning under circumstances incompatible with a voluntary waiver of the fundamental right to counsel.

> But few cases will be as clear as this one. * * *

*Id.* at 489–90, 101 S.Ct. at 1887–88.

> Who 'initiated' a conversation may be relevant to the question of waiver, but it is not the *sine qua non* to the inquiry. The ultimate question is whether there was a free and knowing waiver of counsel before interrogation commenced.
>
> If the Court's opinion does nothing more than restate these principles, I am in agreement with it. I hesitate to join the opinion only because of what appears to be an undue, and undefined, emphasis on a single element: 'initiation.'

*Id.* at 491, 101 S.Ct. at 1888. The majority opinion did not directly respond to this alternative reading.

My final concern is with this court's alternative opinion that even if the confession obtained at the second, counsel-less interrogation was constitutionally impermissible, its reception into evidence was, beyond a reasonable doubt, without prejudice. The stated reason is that "[i]n the face of the overwhelming evidence [of defendant's guilt], the discovery that a pay-off had been mailed [to accomplice Weber] was a minor addition to the state's case against appellant." This appears inconsistent with the

---

1. Chief Justice Burger, likewise concurring only in the judgment, based his concurrence on the fact that when Edwards told the officer that he did not wish to speak to the detectives he was told by the officer "that he had to." "This

is enough for me," Justice Burger said, "and on this record the Supreme Court of Arizona erred in holding that the resumption of interrogation was the product of a voluntary waiver * * *." 451 U.S. at 488, 101 S.Ct. at 1887.

court's opinion in *State v. Caldwell*, 322 N.W.2d 574 (Minn. 1982), in which a new trial was granted the convicted defendant because of inadvertent expert opinion testimony incorrectly identifying a fingerprint as that of the defendant, notwithstanding acknowledgment that it may well be that, upon retrial, the other evidence will prove sufficient to convict him. In my view defendant Howard's confession directly linking his accomplice, Weber, with the murder and making possible the interception of the pay-off by police authorities, was no less critical than the evidence linking defendant Caldwell with the location of the crime. It may be said here, as it was there, that a jury, absent such evidence, "might" have reached a different result. *Id.* at 584–588. The court's opinion reiterated that "to allow factually strong cases to erode such a basic [due process] right is to deny the existence of the right." *Id.* at 592. The grant of a new trial in Caldwell was based only upon this court's supervisory powers; in the present appeal we are concerned with a more serious issue of constitutional dimension.

AMDAHL, Chief Justice (concurring specially).

I concur in the majority opinion and write only because the special concurrence of Justice Peterson asserts that the majority opinion " * * * appears inconsistent with the court's opinion in *State v. Caldwell* * * *." It seems to me there can be no valid comparison, and thus no inconsistency between admittedly false testimony on a fact of such basic import as the defendant's fingerprints tying him to the locale of the crime, and evidence, as here, the truth of which is not questioned.